## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                         **Plaintiff,**<br><br>      v.<br><br>**NEWTON JONES,**<br>**WILLIAM CREEDEN,**<br>**KATERYNA (KATE) JONES,**<br>**WARREN FAIRLEY,**<br>**LAWRENCE McMANAMON, and**<br>**CULLEN JONES**<br><br>                         **Defendants.** | Case No. 2:24-cr-20070-DDC-TJJ |

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' EXPERT DESIGNTIONS AND MOTION IN LIMINE TO PRECLUDE CERTAIN EXPERT TESTIMONY

Now comes the UNITED STATES OF AMERICA, by Ryan A. Kriegshauser, United States Attorney for the District of Kansas, and respectfully responds in opposition to Defendants' notice of expert testimony and moves *in limine* to preclude Defendants from offering certain expert opinion testimony as described herein.

I. **LEGAL STANDARD**

    A.  **Motions** *In Limine*

A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*. District courts must "carefully and meticulously" review the proffered evidence when deciding whether to admit or deny the expert testimony. *Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 586 (10th Cir. 2016). The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial,

without lengthy argument at, or interruption of, the trial. *Id*. at 263. In particular, a motion *in limine* may be directed toward limiting the subjects about which testimony may be offered, or about which particular witnesses may testify, including expert witnesses.

### B. Federal Rule of Evidence 702

The Rules of Evidence, and Rule 702 in particular, assign the Court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Rule 702 provides that a qualified witness may testify as to his or her opinion only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule's overarching objective is to ensure "the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594-95. "The objective of that requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1163 (10th Cir. 2000).

## II. DEFENDANTS' EXPERT DESIGNATIONS

### A. Jeffrey P. Gaia

The Indictment (doc. 1) alleges that Defendants Newton Jones and William Creeden misused the Bank of Labor ("BOL") as part of the alleged RICO and wire fraud conspiracy, and committed embezzlement by:

a. extending $7 million dollars in loans of Boilermakers Union funds to the Bank of Labor without consulting the Board of Trustees and Executive Council. (Doc. 1 at ¶ 40);

b. leveraging the Boilermakers Union's partial ownership in the Bank of Labor to obtain executive-level employment positions for themselves with the bank. (*Id*. at ¶ 41);

c. enriching themselves by demanding full-time employment with the Bank of Labor including salaries exceeding $400,000 per year for which Defendants Newton Jones and William Creeden performed little or no services as employees for the Bank of Labor. (*Id*. at ¶ 42);

d. enrich themselves by collecting more than $3,400,000 each over the course of thirteen (13) years from the Bank of Labor under the guise of full-time employment for which Defendants Newton Jones and William Creeden performed no services for the Bank of Labor. (*Id*. at ¶ 43); and

e. receiving hundreds of thousands of dollars in retirement payments from the Bank of Labor Retirement Plan when they were not eligible to participate in that plan or receive those payments. (*Id*. at ¶ 44).

In response, Defendants Newton Jones and William Creeden submitted a report from Jeffrey P. Gaia dated November 25, 2025. In it, Gaia provides a bullet list of eleven opinions (Gaia Report at page 5) which concluded that: BOL was a struggling bank which required strategic rethinking; Newton Jones developed a growth strategy for BOL and Jones and Creeden devised and implemented this Labor Strategy to change BOL from a community bank to a national labor bank; BOL benefited from Jones and Creeden's reputations and labor contacts. Jones and Creeden hired a team to implement this strategy day to day; the Labor Strategy was successful, and its growth was proportional to the Jones' and Creeden's

compensation; Jones and Creeden did not have unchecked influence on BOL; and the $7 million loan from the IBB to BOL was a normal and customary equity injection.

As evident from the summary of opinions, Mr. Gaia's report offers irrelevant and inadmissible opinions that will not help the trier of fact determine whether defendants are innocent or guilty of the charges offenses, and which are on topics inappropriate for expert testimony.

### i. Gaia's methodology is insufficient and not reliable

While Gaia may qualify as a banking industry *expert*, such expertise does not allow him to make findings of fact and legal determinations disguised as *expert* opinion. His report, however, establishes that this is exactly what he did. As a result, his methodology − or lack thereof − in providing such opinions is fatally flawed. Assuming Gaia is deemed to be qualified as a banking industry expert, a gatekeeping analysis for this Court to perform is whether Gaia's methodology is sufficiently reliable as determined by the sort of inquiry mandated by the Supreme Court in *Daubert*. The Tenth Circuit has outlined several inquiries a court should perform in determining whether the methodology is reliable: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). When the expert relies on experience instead of science, the same elements apply.

While these are guideposts for a court to use, the trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative

before it can be admitted." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995); Fed. R. Evid. 702 advisory committee's notes (2000 amends.). In analyzing Gaia's experience-based methodology, it is clear it is insufficient and unreliable and does not pass muster under *Daubert* and its progeny. Gaia's opinions on BOL performance, Jones' strategy, Jones and Creeden's compensation compared to the Bank's growth, etc, are simply speculative statements of Gaia, a fact witness with no personal knowledge disguised as an expert, with opinions not based on methodology or principles, but rather a re-imagining of the bank and Jones' performance in the most self-serving manner possible.

While Gaia's Report, at times, references records that he has reviewed, such as FBI interviews or FDIC examination reports, Gaia never explains whether those records were the totality of records he relied on, whether other records aided his opinions; or how his experience in the banking industry assisted his analysis of the evidence in this case. Essentially, Gaia never provides a basis for his opinions. As a result, the government has no way of challenging the basis for these opinions, testing the accuracy of these opinions, understanding his methodology or providing his methods reliable or unreliable.

### ii. Gaia's opinions are irrelevant to the trier of fact

Gaia's submission of proposed testimony is essentially a long narrative of how well the Bank of Labor had done during Jones and Creeden's tenure. This is largely irrelevant opinion which dips far into argument. "Even if scientifically valid, the expert testimony must 'fit'—it must relate to a disputed issue in the case." *Id*. at 591-92. *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016). Whether the Bank of Labor was thriving or failing or somewhere in between under their tenure is not relevant to whether Jones and Creeden had arranged no-show employment for themselves as CEO and Senior Executive VP at the Bank

of Labor. Further, whether the "Labor Strategy" was successful is entirely irrelevant to the issue of the existence of such employment and whether the elements of fraud were present. Significantly, Gaia describes the Labor Strategy as a strategy Jones developed while Chairman on BOL. Gaia simply merges the roles of Chairman of the BOL board with Chief Executive Officer and member of the BOL board with Senior Executive Vice-President while wholly ignoring the fact that these were discrete positions, with different duties and different levels of compensation. These unfounded opinions that the Labor Strategy helped BOL do nothing to address the government's main allegations that Jones and Creeden did not perform full-time work as employees of BOL.

Gaia's Report improperly opines on the weight to give other witness statements. For example, Gaia opines, "… it is my opinion that [Megan Elder's] testimony which insinuated that Jones may have had a "No Show" job is unreliable." He attacks another witness, Robert McCall, asserting "McCall was an enabler, not a victim… If he were truly concerned about the ethical nature of these events, his duty could have taken the form of objecting directly to Jones, reporting his concerns to internal audit, informing regulators, or ultimately resigning. But he elected none of these courses of action. Instead, he elected to 'eat at the same table' as the man he accused of defrauding BOL." Such attacks on the credibility of other witnesses is wholly improper. "We have said that the credibility of witnesses is generally not an appropriate subject for expert testimony." *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) citing *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993) ("Many courts exclude expert testimony on the credibility of other witnesses because it usurps a critical function of the jury."). The Court should strike those opinions.

6

Finally, Gaia opines that the $7 million loan from IBB to BOL was viewed favorably by the FDIC as an injection capital for BOL. Rather honestly, Gaia acknowledges "[t]he criticism of this transaction appears to relate to the approval process within the IBB, not the actual transaction as reflected on BOL's side." Gaia's statements is an acknowledgment that his opinion on this topic is entirely irrelevant to whether the loan was an authorized IBB expenditure.

### B. David A. Macpherson

Defendants jointly submit an expert report of David A. Macpherson dated November 26, 2025. Macpherson provided in his report that he was tasked with analyzing "the economic relationships among union density, union wages, durable manufacturing employment, and exports as they relate to this matter." (Macpherson Report at p. 5). His report contains four opinions: (1) more union members lead to higher wages for union members; (2) IBB's decline in union membership was smaller than the average for manufacturing unions; (3) union workers earn higher wagers than nonunion workers; and (4) increase demand for goods and services leads to higher union wages.

#### i. Macpherson's methodology is insufficient and not reliable

As sources for his expert report, Macpherson stated that he reviewed entire websites, which is both unhelpful and impossible. For example, he simply lists the Boilermakers' Union website, "https://boilermakers.org", Center for Union Facts, "https://unionfacts.com", and Union Membership and Coverage Database from CPS, "https://www.unionstats.com". Websites like Center for Union Facts are repositories of publicly available data for labor unions in America. MacPherson's repot lacks reference to records from this case or specific records of the Boilermakers Union, but instead more than a dozen textbooks and scholarly

7

articles on various workplace economic topics, some more than thirty years old. The purpose of Rule 16 is to inform opposing counsel as to what basis proposed expert testimony rests. Defendants have instead provided government counsel with an extended reading list from which a myriad of opinions may be drawn. MacPherson attributions to these works is wholly lacking. For example, his "Opinion 1" regarding union density cites two sources from the 1980's and a study of Norwegian wages in relation to union representation.

Without further information, there is no way of knowing what material Macpherson actually relied upon for his report or the underlying facts that form the basis for his opinions. Without a proper foundation and significant underlying facts forming the basis of his opinions, Mr. Macpherson cannot qualify as an expert. An expert's opinion must be based on sufficient underlying facts or data to be admissible.

Macpherson offers opinions regarding the relationship between certain facts, like Boilermakers Union's decline in membership but he has conducted no reliable analysis on how membership in other manufacturing unions have fared. He simply cites to Unionstats.com for the assertion that union membership in durable manufacturing declined 48 percent between 2003 and 2024, without questioning or analyzing what data or methodology went into the statistics.

### ii. Macpherson's opinions are not relevant to the trier of fact

No relevant issues in this prosecution turn on questions of labor economics. The government is not required to prove any particular theft amount or particular amount of loss to the union. The sources MacPherson relies upon are a dead giveaway of the absence of relevance in his proposed testimony.

MacPherson conducted no examination of any of the facts relevant to the charges in the Indictment.  MacPherson's broad opinions regarding union density, wage premiums, and export markets are presented in short order, but he fails to explain how they relate to whether Defendants were embezzling from the Boilermakers Union or the Bank of Labor. *Etherton*, 829 F.3d at 1217.

MacPherson's history as a proposed expert witness is extensive, but, consistent with his background, restricted exclusively to civil matters requiring economic analysis, not any factual issue of whether criminal thefts have occurred. Macpherson's opinions should be struck.

MacPherson has been disqualified from testifying as an expert at least five times. *See U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 876 (S.D.N.Y. 2015). (As a threshold matter, the Court finds that the majority of Macpherson's report is essentially worthless); *See also United States v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 876 (S.D.N.Y. 2015) ("As a threshold matter, the Court finds that the majority of Macpherson's report is essentially worthless.  He is not an expert on anything related to this case aside from general statistical analysis."); *Martin v. City of Atlanta, Georgia*, 2013 WL 12321961, at *7 (N.D. Ga. 2013); ("Having studied Macpherson's conclusions and the manner in which he reached them, the Court finds that the opinions are not ones which are based on sufficient facts or data and are not the product of reliable principles and methods, including ones that have been peer reviewed to be reliable, relevant, and admissible at the trial in this action."); *Alvarado v. FedEx Corp.*, 2006 WL 1761276, at *7 (N.D. Cal. 2006) (excluding proposed testimony as incomplete).

    **C.  Jamie K. McCallum**

Defendants submitted an expert witness report from Jamie K. McCallum dated November 26, 2025.  McCallum's report provides ten opinions.  In summary form they are: (1) unions are beneficial to its members; (2) union membership in the U.S. has declined as a result of political variables; (3) IBB produced positive results for its members; (4) historic preservation departments are common to unions and beneficial; (5) union regulation are impacted by external and internal controls; (6) IBB's constitution grants the IEC broad authority; (7) leaders of international unions are ambassadors; (8) global engagement is necessary; (9) IBB's global activism benefitted U.S. members; and (10) the government's expert, Lauren Stojak's opinion on expenditures is unreliable and based not based on sufficient facts or data. (McCallum Report at p. 2).

### i. McCallum's methodology is insufficient and not reliable

McCallum's presentation is essentially an advocacy piece on the general benefits of union membership and the Boilermakers Union in particular.  McCallum is a Professor of Sociology at Middlebury College with a focus on work, inequality, labor unions, global unionism, and political economy. He declares that the basis for his opinions are "the knowledge, skill, experience, training, and education discussed in my CV, gained through my work as a sociologist, and obtained in researching and preparing this report." (McCallum report at 3). Many of his opinions are simply self-serving declarations.  For example, while acknowledging the Boilermakers Union sustained declined in membership, he opines that the union has produced positive results for its members.  As a basis for this opinion, he then simply provides examples: one example in 2023 of 282 workers joining the union; an example of workers voting to affiliate with the union in 2022 and a third example of a local Boilermakers Union Local 482 voting for salary and compensation increases.  (McCallum

10

report at 9). These sorts of cherry-picked illustrations are exactly the sort of faux opinion testimony that should be rejected by the Court, which must find that the opinions are properly grounded, well-reasoned, and not speculative before they can be admitted.

In another example of unfounded opinions, McCallum states that historic preservation departments are commonplace and beneficial for unions of the IBB's size and age. (McCallum report at 12). Then, McCallum goes on to acknowledge that this is just a "trend" and "…academic literature on precisely how many unions do this remains modest…" (*Id.*)

In another opinion, McCallum provides the sweeping opinion that "International Executive Council (IEC) minutes from 2012–2022 shows that the Council routinely received and approved detailed financial reports" which "demonstrate that travel expenditures were transparently reported to the Council as part of the union's regular financial oversight process." McCallum devotes a whole of two sentences to this broad generalization of spending by the defendants in that 10-year span. Again, these types of unfounded and self-serving declarations are not the type of expert opinions the Court should allow.  They do not provide a methodology  or principles through which they can be critiqued.

### ii.  McCallum's opinions are not relevant to the trier of fact

The Government's case-in-chief will be properly restricted to whether Defendants were acting in concert to embezzle from the Boilermakers Union and associated charged offenses, not whether the Boilermakers Union was a successful or meritorious representative of its members.

McCallum's proposed digression into irrelevant political issues involving labor unions is destined to generate confusion among jurors over how and why those issues are germane

11

to the legitimate question of whether the defendants in this case joined a particular RICO conspiracy and committed the particular charged embezzlements.

McCallum's sweeping opinion of globalization, which can be summarized as − globalization can harness the power of the world's population and resources − does nothing to aid the jury in understanding whether these defendants embezzled money by lavish international travel in the charged counts that lacked benefit to the Boilermakers' Union.

Finally, McCallum criticizes the proposed expert testimony of Senior Investigator Lauren Stojak of the Department of Labor for failing to consider the purpose of the international trips she analyzed. Indeed, Senior Investigator Stojak's testimony does not purport to analyze the necessity or purpose of any of the international trips underwritten by the Boilermakers Union, but merely to compare the Boilermakers Union composite spending on international travel with those of other similar unions. Should Defendants seek to highlight that simple aspect of Ms. Stojak's analysis, they may do so on cross-examination. It does not provide independent justification of McCallum as an expert witness.

### D. Daniel J. Welsh

Defendants submitted an expert witness report from Daniel J. Welsch dated November 26, 2025. Welsh is a practicing accountant. His first opinion seeks to validate the work of the Boilermakers Union's historic auditor, Legacy Professionals, and to assert that Legacy's audits of the union were normal and expected. For his second opinion, he asserts that the Form 990s filed by the Boilermakers Union reflect the information contained in the union's audited Financial Statements. His third opinion purports to rebut the government's witness Lauren Stojak's opinions.

### i. Welsh' opinions are not relevant to the trier of fact

The officials at Legacy Professionals are not under any suspicion and whether they faithfully recorded the financial information supplied by the Boilermakers Union is not a relevant consideration in this prosecution. Welsh's proposed testimony appears more geared to an accounting or tax fraud prosecution of Legacy Professionals rather than an embezzlement case. Even if the issues presented by Welsh were relevant, the professionals at Legacy Professional, rather than an outsider, would be the most relevant witnesses. Welsh's purported testimony is fact witnesses testimony for which he has not independent knowledge. This fact testimony has been rebranded as expert testimony, like to circumvent the need to call a witness who can be cross-examined on the underlying facts.

### i. Welsh purports to offer a forthcoming opinion disguised as rebuttal

Welsh asserts that Stojak's conclusions regarding lack of necessity are unreliable and not supported by accounting principles. However, he does not provide any support for this opinion, but rather, that he "expects to identify and explain accounting principles and methods used in audits, and the publicly filed reports that reflect disbursement for the benefit of IBB members, or for official IBB business including travel expenses." Welsh's submissions also states that he will "continue" to review discovery, may update his opinions, and reserves his right to do so based on the opinions of the other proposed experts. (Welsh Report at 4-5).

Welsh's testimony is affirmative expert testimony masquerading as rebuttal. "[R]ebuttal expert testimony must contradict 'new unforeseen facts brought out in the other side's case.'" *Century Indemnity Co. v. Marine Grp.*, LLC, 2015 WL 5521986, at *3 (D. Or. Sept. 16, 2015). If the purpose of expert testimony is to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one. *Id*. citing *Spring Creek Exploration & Production*, 2016 WL 1597529 at

13

*3. Where the subject matter of the expert's testimony concerns a matter the designating party knew or should have known would be part of its opponent's case-in-chief, that expert is an affirmative expert. *See Bonser v. Waste Connections of Colorado, Inc.*, 2020 WL 1986477 at *4 (D. Colo. April 27, 2020). *See also Estate of Smart v. City of Wichita*, 2020 WL 3618851 at *2 (D. Kan. July 2, 2020) ("[C]ourts will disallow the use of a rebuttal expert to introduce evidence more properly a part of a party's case-in-chief.")

Rule 16 requires parties to provide a "complete" statement of "all" opinions that will be elicited in the proposed witness' testimony, not merely an "expectation" that he will contradict another expert witness. Welsh similarly fails to state the complete "bases and reason" for his proposed opinion as required by Rules 16, in favor of stating he "may" update his sources. Finally, Welsh's reservation of his right to change his opinions in the future leaves the Court and the Government to guess where his testimony might land. The proposed testimony of Welsh should thus be excluded alone on the grounds that Defendants have failed to satisfy the completeness requirements within Rule 16. Because Welsh has not currently provided any grounds for concluding that Stojak's conclusions are improper, his opinion should be stricken.

## Conclusion

WHEREFORE, the Government respectfully requests that the Court limit the ability of defendants' expert testimony as described above.

Respectfully submitted,

RYAN A. KRIEGSHAUSER

UNITED STATES ATTORNEY

By: /s/Faiza H. Alhambra
FAIZA H. ALHAMBRA

14

Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6904
913-551-6541 (fax)
Faiza.Alhambra@usdoj.gov
Kan. S. Ct. No. 24525

By: */s/ Jabari B. Wamble*
JABARI WAMBLE
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6730
913-551-6541 (fax)
Jabari.wamble@usddoj.gov
Kan. S. Ct. No. 22730

By: */s/ Vincent Falvo*
VINCENT FALVO
Trial Attorney
Violent Crime and Racketeering Section
United States Department of Justice
1301 New York Avenue, NW, Room 753
Washington, D.C. 20530
(202) 353-9384
vincent.falvo@usdoj.gov

15

## **CERTIFICATE OF SERVICE**

      I certify that on January 2, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

                                            */s/ Faiza H. Alhambra*
                                            Faiza H. Alhambra
                                            Assistant United States Attorney