IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES,

                        **Plaintiff,**

                     **v.**

NEWTON JONES (01),
WILLIAM CREEDEN (02),
KATERYNA JONES (03),
LAWRENCE MCMANAMON (05),

                     **Defendants.**

Case No. 24-20070-DDC

## MEMORANDUM AND ORDER

Both sides of the caption seek to introduce expert testimony at trial. And each side has a problem with the other side doing so. The government seeks to qualify Lauren Stojak as an expert, and defendants have moved jointly to exclude her testimony. Doc. 214. Defendants proffer four experts, and the government seeks to exclude all four. Doc. 212. This Memorandum and Order addresses the challenges to the government's expert and three of the four defense experts. It assumes familiarity with the background of the case and begins with the legal standard governing these disputes.

## I.     Legal Standard

Under Rule 702, the court bears a "gatekeeping obligation" to determine whether expert testimony is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). When it performs this gatekeeping role, the court has broad discretion. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496,

1499 (10th Cir. 1996).  Courts exercise this discretion under the standard adopted in Fed. R.

Evid. 702, a rule providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Rule '702 requires the district court to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Earls*, 129 F.4th 850, 862 (10th Cir. 2025) (quotation cleaned up) (quoting *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 770 (10th Cir. 2019) (per curiam)).  Courts perform the Rule 702 inquiry in two stages. *First*, the court must "decide whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702). *Second*, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (citing *Nacchio*, 555 F.3d at 1241).  "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

2

The court starts its work with the government's putative expert.

## II.        Lauren Stojak

The government seeks to admit testimony from Lauren Stojak, a lead investigator for the International Compliance Audit Program at the at OLMS.  Doc. 175-1 at 2.  Stojak has performed "86 compliance audits, uncovering embezzlement" and other financial crimes and regulation violations.  *Id.*  She performed data analysis in 2019 that identified IBB as a union with unusually high disbursements for official business.  *Id.*  She thus recommended IBB for a compliance audit.  *Id.*  This IBB audit uncovered "questionable, excessive, and personal credit card expenditures" on international travel.  *Id.* at 3.  So, Stojak referred IBB for criminal investigation.  *Id.*

Stojak's report analyzes data from IBB's Form LM-2—a disclosure form that labor organizations with total annual receipts greater than $250,000 must file.  *Id.* at 4–5.  Her report zeroed in on Schedules 15–19 on this form.  *Id.* at 5.  These schedules disclose representational activities; political activities and lobbying; contributions, gifts, and grants; general overhead; and union administration.  *Id.*  Stojak compiled data from other unions who also filed the same Form LM-2 as IBB and compared the unions' expenditures on international travel.  *Id.* at 6.

The government disclosure asserts that Stojak will offer the following opinions:

- Defendants were among the top recipients of salary and reimbursed expenses of all union officials in the United States and Canada.  Doc. 175 at 3.

- IBB "spent more than twice as much [on] international travel as the next highest union and nearly eighteen (18) times as much per member as the next highest union."  *Id.* at 4.

- Defendants' excessive reimbursed expenses and spending on international travel are "prominent indicator[s] of embezzlement[.]"  *Id.* at 3, 5.

- IBB "systemically underreported funds spent on international travel."  *Id.* at 4, 7 n.4.

As the court explains next, Stojak's first two opinions are lay opinions—not expert opinions. But Stojak's other two opinions are of the expert variety, and both lack a coherent methodology and thus aren't reliable.

### A.      Lay Testimony

Start with Stojak's first two opinions, ones that the court qualifies as lay opinions. Recall that the bulk of Stojak's report compares disclosures from IBB's Form LM-2 to disclosures from other unions. And, her report finds, IBB's expenditures on international travel—both in absolute and per-member metrics—dwarfed other unions' comparable expenditures. This simple data compilation and comparison is lay testimony.

Our Circuit has identified four factors guiding how trial courts should distinguish between expert testimony (subject to Rule 702) and lay testimony (governed by Rule 701). *First*, courts consider "whether the testimony" satisfies Rule 701's requirements—"that is, whether the testimony [is] '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge.'" *United States v. Dermen*, 143 F.4th 1148, 1210 (10th Cir. 2025) (quoting Fed. R. Evid. 701)). *Second*, courts ask "whether the testimony was based on professional experience." *Id. Third*, courts "look to whether the expert relied on a technical report [rendered] by an outside expert." *Id.* (quotation cleaned up). And *fourth*, courts "consider[] how the Federal Rules of Evidence generally classify the testimony at issue." *Id.* These factors suggest that Stojak's testimony about union data is lay testimony. Take each one, in turn.

*First*, Stojak's data compilation—while perhaps laborious and time consuming—satisfies Rule 701. Our Circuit has held that "a witness should be permitted under Rule 701 to testify to elementary mathematical operations like the simple average[.]" *Id.* at 1211 (quotation cleaned

4

up).  But testimony about "more technical, specialized subjects like . . . sophisticated economic models" that "requires more than applying basic mathematics" is beyond the scope of Rule 701. *Id.* (quotation cleaned up).  Stojak's data compilation employs simple mathematics.  She compiled data from forms submitted by IBB and other unions, and she compared that data.  *See* Doc. 175-1 at 6.  At bottom, her work—aggregating expenditures and calculating per-member totals—relies on "elementary mathematical operations[.]"  *Dermen*, 143 F.4th at 1211.  That is, her data analysis relies on addition and division—which are simple mathematical concepts that don't require expertise to understand or apply.  And the Federal Rules of Evidence specifically contemplate the type of aggregating that Stojak has performed.  *See Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1124 (10th Cir. 2005) (rejecting argument that "mere calculation of an average of 103 numbers" requires expertise and noting that the "Federal Rules of Evidence clearly permit the contents of voluminous writings to be presented in the form of a . . . calculation" (quotation cleaned up)).  The "probative value" of Stojak's report and proposed testimony "derives not from its technical complexity, but from the simple" data it compiles and summarizes "in a clear and digestible format."  *Dermen*, 143 F.4th at 1212–13 (citing Fed. R. Evid. 1006).  This first factor suggests that Stojak's data-compilation efforts are lay ones.

*Second*, Stojak's testimony about union analytics isn't based on professional experience. "'Rule 701 does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.'"  *Id.* at 1213 (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)).  So, "when the subject matter of proffered testimony constitutes scientific, technical, or other specialized knowledge, the witness must be qualified as an expert under Rule 702."  *Id.* (quotation cleaned up).  But the Federal Rules don't "distinguish between

expert and lay *witnesses*, but rather between expert and lay *testimony*." Fed. R. Evid. 701 advisory committee's note to 2000 amendment (emphases in original). As such, "a witness who possesses scientific, technical, or other specialized knowledge (and could therefore be considered an expert witness in certain settings) can testify as a lay witness (i.e., offer lay testimony) so long as the testimony is not based on such knowledge." *Dermen*, 143 F.4th at 1213 (quotation cleaned up).

Here, Stojak doesn't base her testimony about union data on specialized knowledge. To the contrary, it's information that she learned in the course of the investigation. *See United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1259 (10th Cir. 2020) ("[A] law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony[.]"). In other words, Stojak's data compilation and analysis reflect her "*particularized* knowledge derived from" her position as an OLMS investigator; it's not based on her "*specialized* knowledge derived from" her expertise and experience. *Dermen*, 143 F.4th at 1214 (emphases in original). In short, under Circuit law, Stojak's proposed testimony about union data is lay testimony.[1]

The court thus denies the government's motion to admit Stojak's first two opinions as expert testimony under Rule 702. And the court grants defendants' motion to exclude these expert opinions under Rule 702. Neither party has sought an advanced ruling on whether these lay opinions otherwise are inadmissible for some other reason. So, the court leaves that issue for another day.

---

[1]    The third and fourth factors support this conclusion, too. For the third factor, Stojak doesn't rely on "a technical report by an outside expert" but on "documentary evidence and summary exhibits that were prepared by" Stojak herself. *Dermen*, 143 F.4th at 1214 n.18 (quotation cleaned up). The fourth factor asks "how the Federal Rules of Evidence generally classify the testimony at issue[.]" *Id.* The Circuit, applying this fourth factor, held that similar summary testimony in *Dermen* was lay testimony because it complied with Rule 1006. *Id.*

B.        Expert Testimony

Now consider Stojak's other two opinions.  Recall that the government seeks to elicit testimony from Stojak that excessive reimbursed expenses and international-travel expenditures are "prominent" indicators of fraud.  Doc. 175 at 3, 5.  And the government wants to admit Stojak's opinions that IBB "systematically underreported" its spending on international travel. *Id.* at 4, 7 n.4.  The court excludes these putative expert opinions and now explains why.

Stojak didn't utilize a reliable methodology to reach these two conclusions.  Indeed, her report never explains how she reached these opinions.  To be sure, her report details how she compiled the data in her report.  *See* Doc. 175-1 at 5–6.  But it never explains how she formed her opinion that IBB's large travel expenditures are indicative of fraud or that IBB underreported its travel spending.  *See United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015) (explaining that witnesses "are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions").

Stojak's report explains that she located one instance of IBB failing to itemize about $100,000 of international-travel expenditures on its Form LM-2.  Doc. 175-1 at 3.  Testimony about this fact—one particularized to this investigation—is lay testimony.  *See Dermen*, 143 F.4th at 1214.  Neither the government nor Stojak's report ever identify a methodology for extrapolating from this singular instance of underreporting to an opinion concluding that IBB "systematically" underreported its expenditures.

The closest that Stojak (or the government) gets to explaining her methodology is a perfunctory reference to her experience.  *See* Doc. 175-1 at 9 ("Based on my experience conducting 86 compliance audits, 11 international compliance audits, and a thorough review of 15 years of LM data, [N. Jones's and Creeden's] extensive international travel . . . is atypical, shows a lack of necessity and union benefit, and constitutes a prominent indicator of

7

embezzlement."). This passing reference to Stojak's testimony can't carry the day. "Expert testimony based on experience alone must reveal how the experience led to the expert's conclusion, why the experience is a sufficient basis for the opinion, and how the experience was reliably applied." *United States v. Martinez*, 88 F.4th 1310, 1314 (10th Cir. 2023) (quotation cleaned up). Neither Stojak's report nor the government's disclosure nor the evidence at the hearing satisfy any of these requirements. And the "court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note to 2000 amendment (quotation cleaned up). Here, the government offers no more than Stojak's experience and her say-so. That's simply not enough.

The court thus denies the government's Motion to Admit (Doc. 175) in its entirety. And, the court grants defendants' Motion to Exclude (Doc. 214). Stojak may not testify as an expert at trial. Next, the court addresses the government's challenge to three of the four defense experts, starting with McCallum.

## III.    Jamie McCallum

The defense has proffered the testimony of Dr. Jamie K. McCallum, an academic who has dedicated his career to studying labor unions. Doc. 221-3 at 4. McCallum has ten opinions. The government seeks to exclude McCallum's testimony. Doc. 212. From the outset, it's worth mentioning that the government's argument is thin; a mere two-and-a-half pages to argue against ten opinions. *Id.* at 10–12. As a result, the government's motion doesn't address all ten opinions clearly. What's more, the government doesn't cite any caselaw to support its argument.

Instead, the government opted for an ambush at the *Daubert* hearing, confronting McCallum with exhibits and arguments not advanced in its papers. That's not a helpful way to litigate a *Daubert* issue. It's not the court's job to connect the government's examination of the

8

expert to the few arguments made in the government's brief.[2]  These deficiencies aside, the court

grants the government's request to limit McCallum's testimony—but only in part.  The court

explains why, below, beginning with an overview of McCallum's ten opinions.

### A.    McCallum's Opinions

McCallum is a professor of sociology at Middlebury College.  Doc. 221-3 at 4.  He's

written extensively about unions, including four books.  *Id.*  The government doesn't challenge

his credentials.  McCallum first provides two general, background opinions about unions:

- **Opinion 1**:  Unions secure higher wages, more robust benefits, and better working conditions for their members compared to non-union workers in the same industry.

- **Opinion 2**:  Unionization and its member benefits have steadily declined in the United States as a result of relaxed government oversight of employers and government and employer hostility to unions.

*Id.* at 6–9.

McCallum then turns to the union at the heart of this case—the IBB—in his third opinion.

It opines:

- **Opinion 3**:  From 2002 to 2024, IBB produced positive results for its members.

*Id.* at 10.  He notes that, following the broader national decline in union membership, IBB also

"has experienced a sustained decline in membership."  *Id.*  He then provides three examples of

"organizing gains" that IBB achieved:

- in 2022, production and maintenance workers at a cement plant in Wyoming voted to affiliate with IBB;

- in 2023, a Georgia battery plant voted to join the union; and

---

[2]    Nor would it have helped to hold oral argument on the new information the government presented in the *Daubert* hearing, because arguments first raised at oral argument are waived.  *Valdez v. Macdonald*, 66 F.4th 796, 843 n.54 (10th Cir. 2023).  The government also never filed a reply to its *Daubert* motion, and never asked to file supplemental briefing.  Though that wouldn't have helped much, either.  *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived.").

- in 2023, Local 482 members at a coal terminal in Kentucky ratified a five-year contract including increased salary and benefits.

*Id.* Based on these examples, McCallum asserts "that IBB's collective bargaining has produced consistent upward movement in wages and benefits," and IBB, he opines, can "deliver material gains for its members across diverse sectors of the U.S. economy." *Id.* at 11. McCallum also highlights IBB's legislative and political advocacy, where IBB trains local representatives to lobby on issues affecting members. *Id.* McCallum mentions IBB's controlling interest in the Bank of Labor, a bank that "provide[s] IBB members with banking services tied closely to the values and needs of working people." *Id.* at 13.

McCallum's fourth opinion might seem strange at first:

- **Opinion 4:** Historic preservation departments are commonplace and beneficial for unions of the IBB's size and age.

*Id.* But it makes sense when considered in light of defendant Cullen Jones's media-production work at IBB. McCallum provides examples of other unions commissioning or sponsoring projects about their history and claims that Cullen[3] contributed to those efforts by working "across all phases of the production process on many" of IBB's historical projects. *Id.* at 13–15.

In his fifth opinion, McCallum explains the forces that regulate unions.

- **Opinion 5**: Union regulation depends on oversight by the DOL, union federations, and the members through internal democratic controls.

*Id.* at 15. He begins with federal law: the Labor-Management Reporting and Disclosure Act. *Id.* A statute also allows parent unions to take over local affiliates in cases of corruption, misconduct, or financial insolvency. *Id.* Unions' institutional constitutions also dictate their structure—*i.e.*, a federated structure, direct elections, or representative conventions. *Id.*

---

[3]    The court uses this informal form of this defendant's name to distinguish him from the other two defendants who use the surname Jones.

10

McCallum then explains that centralization matters; a highly centralized union can reduce work stoppages but risks weakening the workers' leverage and dulling participation. *Id.* at 15–16. A decentralized union comes with its own risks and rewards. McCallum emphasizes that these "challenges are compounded when unions operate at the global level." *Id.* at 16.

In his sixth opinion, McCallum again returns to the IBB. He opines:

- **Opinion 6:** The IBB constitution grants the executive council broad authority to carry out the IBB's objectives.

*Id.* McCallum explains the role of a union's executive council. He then explains how IBB's 2021 constitution sets up the IBB's structure: the international president directs union affairs and supervises officers, while the executive council has broad administrative authority. *Id.* at 17. McCallum reviewed selected executive council minutes from 2012 to 2022 and concluded that these minutes show "that the Council routinely received and approved detailed financial reports"—including travel. *Id.* In McCallum's telling, the minutes "demonstrate that travel expenditures were transparently reported to the Council as part of the union's regular financial oversight process." *Id.* McCallum also highlights that "auditors typically concluded that salary adjustments and credit-card expenditures 'appeared reasonable,' indicating that these expenses underwent and passed independent review beyond internal reporting for many years." *Id.* at 18. McCallum's sixth opinion—though framed as a broad statement about the structure of IBB— ultimately concludes that regular council review and external auditing show that travel and other spending "was monitored rather than hidden / unexamined." *Id.*

McCallum's next three opinions focus on international unions:

- **Opinion 7:** Leaders of international unions are ambassadors for unions and for organized labor generally.

- **Opinion 8:** Global engagement by union leaders is necessary to support members in global industries.

11

- **Opinion 9:** IBB's global labor activism benefitted US union members.

*Id.* at 18–28.  To summarize these three opinions:  globalization has led many unions to form international coalitions, federations, and campaigns to influence multinational employers.  *Id.* at 18.  So, some union leaders must engage internationally.  *Id.*  IBB represents workers in industries "highly exposed to globalization[.]"  *Id.* at 19.  As a result, McCallum explains, "purely domestic bargaining is insufficient:  global supply chains and multinational employers require global union strategies."  *Id.*  McCallum explains how global unions work and how global agreements between unions and companies work.  *Id.* at 19–21.  McCallum holds the opinion that, for a global agreement to become effective, they must have "local muscle and strategy."  *Id.* at 21.  To that end, McCallum discusses the importance of "direct, face-to-face relationship building[.]"  *Id.*  With global unions, face-to-face communication requires travel.  *Id.* at 22.  McCallum thus opines that "international travel is not a luxury but a core component of smart labor practice—the human connection that makes transnational solidarity real."  *Id.*  McCallum goes on to give examples of IBB's global activism that benefited its US-based members.  *Id.* at 23–27.

In his final opinion, McCallum rebuts Stojak's opinion.  Recall that Stojak has claimed that IBB's expenditures were atypical, unnecessary, and a prominent indicator of embezzlement.  The court will allow the first part of Stojak's testimony:  IBB's expenditures were atypical.  Stojak reached that conclusion by comparing IBB's expenditures to those of other unions—testimony she may give as a lay witness.  Here's McCallum's final opinion:

- **Opinion 10:**  Lauren Stojak's opinion that IBB's expenditures were atypical, unnecessary, and a prominent indicator of embezzlement is unreliable and not based on sufficient facts or data.

*Id.* at 28.

McCallum wants to attack Stojak for failing to consider *why* IBB travelled internationally. *Id.* He argues that Stojak failed to consider that IBB faces different challenges than other unions. So, in McCallum's view, "above-average travel spending may therefore be fully consistent with legitimate union activity[.]" *Id.* And it's difficult to compare American unions' travel because they "participate unevenly" in global unions. *Id.* Stojak fails to consider, McCallum asserts, whether any of the travel considered in her report—by IBB or any other union—"was necessary, appropriate, or beneficial to their members." *Id.* at 28–29.

With that inventory of McCallum's ten opinions, the court next evaluates the government's motion to exclude these opinions.

### B.    Analysis

The government challenges McCallum's opinions on two fronts. The government first challenges the sufficiency and reliability of McCallum's methodology. Doc. 212 at 10–11. The government then argues that McCallum's opinions aren't relevant. *Id.* at 11–12. The court considers each argument, in turn, below.

### 1.    Reliability and Sufficiency

The government claims that "many" of McCallum's opinions are "simply self-serving declarations." *Id.* at 10. As an example, the government attacks McCallum's Opinion 3, which provides that, though IBB's membership has declined over time, IBB has produced positive results for its members. The government's problem with this opinion is that McCallum provides only three examples to support it. *Id.* On similar grounds, the government also attacks McCallum's Opinion 4, about the importance of historical preservation to unions, and Opinion 6, about IBB's executive council review of financial reports. The court will tackle each opinion in turn. First, though, the court must address a unique aspect of McCallum's reliability:  his social-science background.

McCallum works in the social sciences, a field that presents unique issues for the *Daubert* inquiry. The Supreme Court, in *Kumho Tire Co. v. Carmichael*, held that the reliability standard for nonscientific experts is "flexible." 526 U.S. at 141. So, "*Daubert*'s list of specific factors neither necessarily or exclusively applies to all experts or in every case." *Id.* To utilize this flexibility, district courts enjoy "broad latitude" to decide "*how* to determine reliability[.]" *Id.* (emphasis in original). "Social science research, theories and opinions cannot have the exactness of hard science methodologies. Peer review, publication, potential error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Ramah Navajo Sch. Bd., Inc. v. Sebelius*, No. 07 CV 0289 MV, 2013 WL 12303945, at *16 (D.N.M. May 9, 2013) (quoting *United States v. Joseph*, 542 F.3d 13, 22 (2d Cir. 2008), *abrogated on other grounds by Hedgpeth v. Pulido*, 555 U.S. 57 (2008)); *see also United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (explaining that, because social sciences lack the exactness of hard sciences, "trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case" (quotation cleaned up)).

As a social scientist, the court must rely heavily on McCallum's knowledge and experience. And McCallum's got plenty of experience. He's written an award-winning book about unions. Doc. 221-3 at 4. He's interviewed and advised workers, organizers, leaders, and strategists. *Id.* He also consults with unions and employers. *Id.* at 4–5. Indeed, his scholarship, teaching, consulting, and public writing all focus on labor unions. *Id.* at 4.

The court thus concludes that McCallum's experience renders him reliable—but only to an extent. This reliability can't overcome other deficiencies in his opinions.

14

### a.    Opinion 3

Start with Opinion 3.  The government claims that McCallum lacks sufficient facts to opine that IBB produced positive results for its members from 2002 to 2024.  Fed. R. Evid. 702(b) requires an expert to base testimony "on sufficient facts or data[.]"  A sufficiency challenge asks "whether the expert considered enough information to make the proffered opinion reliable."  29 *Wright & Miller's Federal Practice & Procedure* § 6268 (2d ed. 2026).  This is a quantitative question, not a qualitative one.  *Id.*  Part of the inquiry asks whether the expert ignored data.  *Id.*  "If an expert 'cherry picks' favorable data in this manner but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data."  *Id.*

The government is correct that McCallum's Opinion 3 has a sufficiency problem.  McCallum cites three examples of union victories:  the 2022 cement plant vote to affiliate with IBB, the 2023 battery plant unionization, and the 2023 coal terminal contract.  But, even assuming those dates are correct,[4] McCallum proposes to testify about a 22-year window.  Doc. 221-3 at 10.  Yet he only has assembled examples from two of those 22 years.  Three examples from two years provide insufficient data for a broad conclusion about a 22-year timespan. Beyond these three examples, McCallum discusses IBB's program that trains local representatives to lobby on issues affecting IBB.  *Id.* at 11.  He fails to tie this training program to any benefit for IBB members, however.  He merely recites the activities of the program. McCallum also mentions that IBB submitted formal comments on regulatory matters and provides an example.  But he never mentions whether any of these efforts have proven successful

---

[4]    At the *Daubert* hearing, the government adduced evidence that McCallum's dates about the Georgia battery plant and the Wyoming cement plant are wrong.  Gov. Ex. 10; Gov. Ex. 11.  Assuming the government is correct that two of McCallum's examples occurred in 2025, then that evidence bolsters the court's conclusion about the reliability of Opinion 3.

15

and produced a benefit for IBB members.  Nor does McCallum explain why regulatory comments, standing alone, provide a benefit to IBB members.  McCallum goes on to discuss IBB's controlling interest in the Bank of Labor.  *Id.* at 11–12.  The Bank of Labor's successes are not IBB's successes; IBB merely owns a controlling interest in the Bank of Labor.  So, this evidence about the Bank of Labor doesn't suffice to render an opinion about IBB.

In sum, McCallum opines that IBB has delivered positive results for its members from 2002 to 2024 based on three examples drawn from just two years and political advocacy of unknown efficacy.  The court concludes that McCallum simply did not base Opinion 3 on sufficient facts or data.  It thus grants the government's motion to exclude McCallum's Opinion 3.

b.      Opinion 4

Recall that McCallum's Opinion 4 claims that historical "preservation departments are commonplace and beneficial for unions of the IBB's size and age."  Doc. 221-3 at 13.  This opinion addresses the allegations about Cullen Jones.  In Count 36, the government has charged that four of the defendants embezzled from IBB by paying $413,340.03 in salary and benefits to Cullen Jones.  Doc. 1 at 35 (Indictment).  According to the government, Cullen "was not required to work" and "performed little or no productive work."  *Id.*

McCallum explains that Cullen worked on IBB's media-production work.  Doc. 221-3 at 14–15.  He "develop[ed] shoot plans, obtain[ed] required filming permits, travel[ed] to project sites for on-location work, and conduct[ed] post-production activities, including video and audio editing."  *Id.* at 15.  The reason defendants need McCallum is for his ability to connect Cullen's work to the mission of the IBB.  McCallum opines that "unions have a professional and organizational interest in preserving their historical legacy."  *Id.* at 13.  Some unions employ archivists and historians.  *Id.*  Some produce heritage publications.  *Id.*  McCallum claims these

16

activities benefit labor unions.  *Id.*  And he provides "four cases of unions commissioning or directly sponsoring heritage projects—spanning film, oral history/archival preservation, and public-facing history."  *Id.* at 14.  IBB is one of the examples.

The government calls McCallum's opinion "unfounded."  Doc. 212 at 11.  The court agrees but only to an extent—four examples don't make something common.  And McCallum didn't provide the number of unions similar to IBB's size and history for the court to determine whether four examples suffice to show a practice is common.  So the court bars McCallum from testifying that historical-preservation department are commonplace because this opinion isn't based upon sufficient facts or data.

The government also complains that McCallum calls historical preservation a "trend" and acknowledges that academic literature on the number of unions with historical projects is "modest."  *Id.* (citing Doc. 221-3 at 13).  On this point, the court disagrees with the government's attack.  Given his expertise and experience, McCallum reliably can opine on the importance of historical projects to a union.  And, though McCallum acknowledged that there isn't much academic literature on this subject, he cites a piece about preserving labor history with archives.  Doc. 221-3 at 13.  In any event, the court has barred McCallum from saying that this practice is common, which should alleviate some of the government's concerns.[5]

### c.    Opinion 6

The government next levels its sufficiency and reliability argument at McCallum's Opinion 6.  Opinion 6 claims that IBB's constitution gave "the Executive Council broad

---

[5]    At the hearing, the government questioned whether McCallum's four cited union examples have historical-preservation departments or a separate archive.  And it made much of McCallum not knowing whether the unions housed the historical efforts internally or externally.  This is an argument over semantics, and thus persuasiveness, not proper *Daubert* fodder.  In any event, the government never made this argument in its motion.  *See generally* Doc. 212.

authority to carry out the IBB's objectives." *Id.* at 16.  Buried in Opinion 6 lies the part that the government complains about:  McCallum's review of executive council minutes from IBB.  *Id.* at 17.  McCallum asserted that he's reviewed selected minutes from 2012 to 2022 and concluded that the council "routinely received and approved detailed financial reports[.]"  *Id.*  From these records, McCallum concludes "that travel expenditures were transparently reported to the Council as part of the union's regular financial oversight process."  *Id.*

The government complains that this is an "unfounded and self-serving declaration[.]"  Doc. 212 at 11.  But it's not unfounded.  McCallum reviewed the meeting minutes.  Nor is it clear what the government means by "self-serving."  That's just not one of the criteria courts use to evaluate expert testimony.

At the hearing, the government accused McCallum of reviewing cherry-picked meeting minutes and hammered him for failing to review all union minutes.  That is, McCallum reviewed 80 pages of meeting minutes, and the government represented that the full set was 1300 pages.[6]  That attack may prove fertile ground for cross-examination, but the court won't exclude McCallum's opinion on this basis.  Here's why:  a logical basis exists for McCallum's opinion.  He's a labor-union expert who knows how labor unions work.  And, with that experience, he reviewed meeting minutes and reached a conclusion about how IBB worked.  Sure, he could have reviewed more meeting minutes.  But when "a logical basis exists for the expert's opinion[,] the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony."  *Fish v. Kobach*, 304 F. Supp. 3d 1027, 1041 (D. Kan. 2018)

---

[6]    The government overplayed its hand here.  McCallum reviewed 80 pages of minutes from 2012 to 2022.  Doc. 221-3 at 17.  The government represents that there are 1300 pages of minutes—but then said that those minutes come from the era 2009 to 2024.  So, at least some of those 1300 pages of minutes come from periods outside the scope of McCallum's opinion.

(quotation cleaned up); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").[7]

The court thus concludes that the government's attack on the sufficiency and reliability of McCallum's opinions succeeds in part. The court excludes Opinion 3 in its entirety and excludes Opinion 4 to the extent it classifies historical-preservation departments as "commonplace." It next considers the government's relevance argument.

### 2.    Relevance

The government argues that what's relevant in this case is whether defendants acted "in concert to embezzle from the Boilermakers Union[.]" Doc. 212 at 11. In contrast, the government claims that whether IBB "was a successful or meritorious representative of its members" simply isn't relevant. *Id.* The court evaluates these arguments by starting with the governing relevance standard.

Fed. R. Evid. 702(a) requires that an expert "help the trier of fact to understand the evidence or to determine a fact in issue[.]" "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue[.]" *Wright & Miller* § 6265.2. "The most important factor in determining whether expert testimony will 'help' is the jury's need for expert testimony to

---

[7]    At one point during the *Daubert* hearing, the government questioned McCallum about his lack of experience in finance, seemingly implying that McCallum was unqualified to render this opinion about financial reporting. There are two problems with this line of attack. *First*, McCallum never provided an opinion that required any financial background. In Opinion 6, McCallum describes reviewing auditing statements and then he recites the auditors' conclusions. Doc. 221-3 at 17–18. Based on the audits, McCallum concludes, "expenses underwent and passed independent review beyond internal reporting for many years." *Id.* at 18. This conclusion requires zero financial knowledge; McCallum doesn't need a financial background to understand that an auditor provides independent examination. *Second*, nowhere in its motion challenging McCallum does the government ever argue that McCallum is unqualified to render his opinions. *See* Doc. 212 at 10–12. If the government wanted to challenge to McCallum's qualifications, it should have presented clear argument supported by cited legal authority, rather than relying on a two-and-a-half page argument without a single cite and a new theory presented at a *Daubert* hearing less than one month before the start of trial.

accurately determine the facts." *Id.* So, "expert testimony helps where it clarifies esoteric matters beyond the ken of most lay people." *Id.* On the other hand, "expert opinion testimony may not be helpful where there is other evidence or other means to put the jury in a position to accurately decide the facts." *Id.*

On relevance grounds, the government challenges "McCallum's proposed digression into irrelevant political issues involving labor unions[.]" Doc. 212 at 11. The government fails to identify which opinions commit this evidentiary sin, exactly. Instead, the government categorizes some unidentified opinions as a digression into irrelevant political issues. But it's safe to assume that the government targets Opinion 1, which discusses the benefits of unions, and Opinion 2, which discusses the steady decline in union membership over time. The government also targets McCallum's "sweeping opinion of globalization" as irrelevant. The court safely can assume that the government, with this argument, is talking about Opinions 7, 8, and 9. Finally, the government asks the court to reject McCallum's Opinion 10—his rebuttal of Stojak's opinion.

The court first addresses the government's relevance attacks on McCallum's Opinions 1 and 2. It then address, together, the relevance of Opinions 7, 8, and 9. And it concludes with the relevance of Opinion 10.

### a.      Opinions 1 and 2

McCallum's first two opinions provide general background information about unions. Opinion 1 provides that unions benefit their members. Doc. 221-3 at 6. This isn't relevant. Opinion 1 merely provides general background information about the benefits of unions. The benefits that unions create for their members are unrelated to any facts at issue in this trial. The jury here will need to focus on how defendants operated within the IBB and whether they embezzled from it. Whether and how unions benefit their members doesn't help the jury answer

that question, or any other question that matters to the charges. The court thus grants the government's motion to exclude McCallum's Opinion 1.

Opinion 2 requires a different approach. Opinion 2 provides that unionization and its benefits has declined in the United States. *Id.* at 7. McCallum also explains why, in his view, unionization has declined: relaxed government oversight and government and employer hostility to unions. *Id.* True, general trends in union membership aren't relevant to union embezzlement. Yet defendants warn that the government presented grand-jury testimony from a witness who blamed defendants for the decline in IBB membership. Doc. 221 at 9. If the government presents this evidence—or any evidence about the decline in IBB membership—then McCallum may testify about other forces that have led to declined union membership. But, at this stage, McCallum's Opinion 2 isn't relevant, and the court grants the government's motion subject to caution. That is, the government, if not careful, could open the door to relevance by discussing IBB's decline in membership. If the government does so, McCallum can testify about Opinion 2.

### b.    Opinions 7, 8, and 9

McCallum's Opinions 7, 8, and 9 deal with global unions. To challenge these opinions, the government constructs a strawman. It claims that McCallum opines that "globalization can harness the power of the world's population and resources" and that this opinion doesn't help the jury. Doc. 212 at 12. As demonstrated by the court's comprehensive inventory of McCallum's opinions, that's not an opinion that McCallum will render. At all. Instead, Opinions 7, 8, and 9 focus on global opportunities and engagement by union leaders and how they benefit union members. The court thus rejects the government's cursory argument that misrepresents the record.

21

In any event, McCallum's Opinions 7, 8, and 9 about international unions are relevant to this case. The indictment alleges that the defendants engaged in a racketeering conspiracy by engaging in unauthorized international travel that was "not necessary to achieve the union's interests or for its benefit." Doc. 1 at 20 (Indictment). McCallum counters this point by explaining why unions wish to engage internationally. He also opines that, for unions with members in global industries, it's "necessary" for union leaders to engage globally. Doc. 221-3 at 19. To engage globally, "face-to-face communication and travel become essential tools for building" relationships. *Id.* at 22. McCallum then provides specific examples of IBB's global labor efforts benefiting IBB members. *Id.* at 22–28. So, these opinions about global unions are helpful to help the jury understand why IBB may have engaged in international work and how IBB's members benefitted from those international efforts.[8]

The court thus denies the government's request to exclude these opinions.

### c.      Opinion 10

McCallum's Opinion 10 is a rebuttal to the government's expert, Stojak. Recall that Stojak opines that IBB spent more on international travel than other unions. The court may admit this testimony as lay testimony. McCallum wants to respond that one can't evaluate the "appropriateness of international travel expenditures . . . without full consideration of the intent of such travel, and the inherent difficulties of transnational coordination among labor unions."

---

[8]      At the *Daubert* hearing, the government suggested that McCallum should've considered the cost of these international activities. McCallum responded that, based on his research and experience, unions don't view these efforts that way. The court finds this a sufficient rejoinder to the government's criticism. The government also suggested that McCallum should've considered whether IBB has done better since withdrawing from global unions. The government never presented any evidence at the hearing nor any argument in its papers about IBB's withdrawal from global unions. This failure aside, the government misses McCallum's central thesis: for unions to prove effective in global industries, they must organize globally. And McCallum, as an expert on global unions, can proffer this relevant opinion to the jury reliably. Plus, it's not clear what the government means about IBB doing "better." The government remains free to cross examine him about this opinion.

Doc. 221-3 at 28.  And one can't compare travel expenditure "without considering the corporate adversaries or movement demands in each sectoral context." *Id.*  McCallum points out that legitimate motives may prompt above-average travel spending and—without any explanation of the travel's purpose—"travel expenditure alone cannot reasonably be interpreted as evidence of financial misconduct." *Id.*  He also emphasizes that American unions "participate unevenly in" global unions.  *Id.*

The government claims that this rebuttal is irrelevant because Stojak "does not purport to analyze the necessity or purpose of any of the international trips underwritten by" IBB.  Doc. 212 at 12.  But that's exactly the point McCallum rebuts.  This is a fair basis on which to criticize Stojak's testimony.  Stojak asserts that IBB spent more on international travel than other unions without considering why that might be so.  And McCallum goes further than any cross-examination of Stojak could—he's an expert on international unions.  What's more, Stojak reaches her conclusion that IBB's level of international spending was "atypical" by comparing its spending to that by other unions.  *See* Doc. 175-1 at 9.  McCallum counters this point by explaining why it's imperfect to compare international travel expenditures between American unions:  they participate unevenly in global unions.  Doc. 221-3 at 28.  This is all fair game.

To recap, then, the court excluded McCallum's Opinion 3 and the "commonplace" portion of Opinion 4 for lack of reliability and sufficiency.  And it excluded Opinion 1 as irrelevant.  Opinion 2 likewise proves irrelevant—unless the government opens the door to the topic of union membership decline.  The rest of McCallum's opinions survive the government's challenge.  The court turns to the challenge of another defense expert next:  David Macpherson.

## IV.    David Macpherson

Defendants seek to admit testimony from David Macpherson, a professor of economics. Macpherson's expert report offers four opinions:

- Greater proportions of unionized workers correlate with higher wages for union members.  Doc. 221-2 at 6.

- The decline in IBB membership over the past 20 years is smaller than the decline in union membership for the broader durable-manufacturing sector.  *Id.* at 7.

- Union workers in manufacturing earn substantially higher wages than comparable nonunion workers.  *Id.* at 8.

- Greater demand for union-produced goods and services results in greater union employment and wages.  *Id.* at 9.

The first, third, and fourth of these opinions aren't relevant and thus aren't admissible. The second opinion is lay testimony, not expert testimony.  The court explains.

Start with the irrelevant opinions.  At this juncture, generic testimony about the benefits of unions and union economics isn't relevant.  It doesn't make any fact of consequence more or less likely.  The court reached the same conclusion about McCallum's Opinion 1—which likewise provided general information about the benefit of unions.  This case won't decide whether unions—in the abstract—are good for their members or not.  So Macpherson's generic opinions about unions and union economics won't help the trier of fact.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (quotation cleaned up)).  The court thus grants the government's request to exclude Macpherson's first, third, and fourth opinions.[9]

Macpherson's remaining opinion—that IBB experienced a comparatively smaller membership decline than the manufacturing sector broadly—isn't expert testimony.  His report explains the elementary calculations that he performed to arrive at this conclusion:  He looked at IBB's membership in 2003—74,917—and its membership in 2024—44,699.  Doc. 221-2 at 7.

---

[9]    The government also challenges Macpherson's opinions as unreliable.  Doc. 212 at 7–8.  Because the court excludes his opinions as irrelevant, it needn't consider this alternative ground to exclude.

24

He then compared these numbers and calculated a 40.3% decline. *Id.* Macpherson performed the same process to compare union membership for the broader durable-manufacturing industry. Union membership in durable manufacturing in 2003 was 1,426,000, and in 2024, it was 741,000. *Id.* at 8. Comparing these numbers gives a 48.0% decline. *Id.* Macpherson performed "elementary mathematical operations" to reach his conclusion. *Dermen*, 143 F.4th at 1206 (quotation cleaned up). His calculations—which are "well within the ability of anyone with a grade-school education"—are "more aptly characterized as" lay opinions "under Fed. R. Evid. 701." *James River*, 658 F.3d at 1214 (quotation cleaned up). Because the court concludes that Macpherson's opinion is a lay opinion, it grants the government's request to exclude this opinion as expert testimony under Rule 702. This ruling doesn't mean Macpherson's testimony is inadmissible. It means, instead, that Rule 702 doesn't provide the doorway for its entrance.[10]

In sum, the court rules that Macpherson may not testify as an expert at trial. That conclusion leaves two more government challenges to defendants' expert witnesses. The court addresses one of those next—Mr. Daniel Welsh. It leaves defendants' final expert—Mr. Jeffrey P. Gaia—for a future order.

## V.      Daniel Welsh

Daniel Welsh, a certified public accountant, has submitted an expert report with three opinions. *First*, he asserts that IBB's auditor, Legacy Professionals, LLP, audited IBB's financial statements following "normal and expected audit process[es]." Doc. 221-4 at 3. The government seeks to exclude this testimony as irrelevant because Legacy is "not under any suspicion[.]" Doc. 212 at 13. *Second*, Welsh opines that certain tax forms filed by IBB, called

---

[10]      The court also has relevancy concerns about this testimony similar to those it expressed about McCallum's Opinion 2. But the court declines to opine on whether this lay testimony is inadmissible on other grounds. The government's motion challenges Macpherson's testimony only as inadmissible under Rule 702. So, the court confines its analysis to that rule.

990s, accurately reflect IBB's audited financial statements.  Doc. 221-4 at 4.  According to the government, no one suspects that Legacy failed to record IBB's financial information faithfully. Doc. 212 at 13.  *Third*, Welsh attacks the government's expert, Stojak.  Stojak opined that IBB's international travel was unnecessary and didn't benefit IBB.  Welsh wants to say that Stojak's conclusions about necessity and benefit to IBB "do not analyze IBB financial statements or Legacy audit working papers."  Doc. 221-4 at 6.  The court addresses the first two opinions together, then takes up the government's challenge to the third.

Start with the government's argument that Welsh's opinions about Legacy are irrelevant. Recall the governing standard for relevance:  whether the expert can help the jury understand the evidence.  Defendants concede that Legacy's accounting practices aren't at issue.  Instead, defendants want to use Welsh's testimony to show—circumstantially—that they lacked intent to participate in the charged RICO conspiracy.  Defendants want to proffer Welsh as an independent expert to vouch for (a) IBB's treatment of expenses and compensation and (b) that the financial reporting followed accounting standards.  That is, someone regularly reviewed defendants' expenses and found those expenses "properly accounted for by IBB as business expenses."  Doc. 221 at 16.  Defendants also emphasize that the government's expert, Stojak, didn't look at Legacy working papers.  *Id.*

The court denies the government's motion to exclude Welsh's opinions one and two, and it will allow him to testify about these topics.  How IBB, its accountants, and its auditors treated defendants' expenses matters.  If Legacy never flagged defendants' expenses, then it arguably is less likely that defendants intended to defraud IBB by charging exorbitant expenses to IBB. Welsh plans to testify that, indeed, Legacy never flagged defendants' expenses.  Perhaps defendants could adduce this same evidence through cross-examination, the accounting records

themselves, or by calling a witness from Legacy. But it seems natural for a jury to wonder if Legacy dropped the ball. Just because the government hasn't accused Legacy of doing so won't prevent the jury from wondering—after all, auditing standards are "complex matters that challenge the ability of lay people to understand." *Wright & Miller* § 6265.2 ("Expert testimony also can be helpful where the subject is simply confusing and the expert can clarify or explain things for the jury."). Welsh can help the jury accurately determine the facts by explaining how auditing works, reciting the results of Legacy's audits, and vouching for the appropriateness of those audits. Auditing standards aren't lay knowledge so, to the extent Welsh can clarify or explain, he will prove helpful. *Id.*

Welsh's third opinion targets the government's expert, Stojak. Recall that Stojak concluded defendants' "extensive international travel beyond Canada, Mexico, and U.S. Territories" was "atypical." Doc. 175-1 at 9. She also concluded that this travel outside of North America "show[ed] a lack of necessity and union benefit, and constitute[d] a prominent indicator of embezzlement." *Id.* Welsh wants to attack Stojak's opinions about "lack of necessity." Doc. 221-4 at 5. The government argues that the court should bar Welsh's attack.

This dispute about Welsh's third opinion is moot. The court has concluded that Stojak's first opinion—the travel was atypical—is lay witness testimony. And it has excluded Stojak's second opinion—about lack of necessity and union benefit from the travel—as unreliable. So, Welsh needn't rebut Stojak's conclusions about lack of necessity.[11]

---

[11]    Welsh's third opinion is moot because it focuses solely on Stojak's conclusions about necessity, and the court is excluding those conclusions. In contrast, McCallum's Opinion 10 more broadly attacks Stojak's conclusion about IBB's allegedly atypical spending—not just necessity.

27

## VI.    Conclusion

The court denies the government's Motion to Admit (Doc. 175) Stojak's testimony as expert testimony because it grants defendants' joint Motion to Exclude (Doc. 214).  It also grants in part and denies in part the government's Motion to Exclude (Doc. 212) defendants' experts—specifically, McCallum, Macpherson, and Welsh.  The part of the government's motion that focuses on Jeffrey Gaia remains pending.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the government's Motion to Admit (Doc. 175) is denied.

**IT IS FURTHER ORDERED THAT** the government's Motion to Exclude (Doc. 212) is granted in part and denied in part.  The part of the motion directed at Jeffrey Gaia remains pending.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Exclude (Doc. 214) is granted.

**IT IS SO ORDERED.**

**Dated this 16th day of April, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**