**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>            **Plaintiff,**<br><br>    **v.**<br><br>**NEWTON JONES,**<br>**WILLIAM CREEDEN,**<br>**KATERYNA (KATE) JONES, and**<br>**LAWRENCE McMANAMON**<br><br>         **Defendants.** | **Case No. 2:24-cr-20070-DDC-TJJ** |

## UNITED STATES' RESPONSE IN OPPOSITION TO MOTION FOR ACQUITTAL BY DEFENDANT CREEDEN PURSUANT TO RULE 29

On May 22, 2026, the Government rested its case-in-chief in this matter. Defendants each moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure at that time. Defendant submitted his initial Rule 29 motion on May 22, 2026. ECF No. 406.[1] The Court deferred decision on most of those motions. On June 5, 2026, the jury found the Defendants guilty of several counts in the Indictment. On June 29, 2026, Defendant Creeden renewed his Rule 29 motion. ECF No. 485.

NOW comes, the United States, by its counsel, Ryan A. Kriegshauser, United States Attorney for the District of Kansas, which opposes such motion, and shows as follows:

### I. APPLICABLE PRINCIPLES

Fed. R. Crim. P. 29(a) provides: "After the government closes its evidence . . . the court on the defendant's motion must enter a judgement of acquittal of any offense for which

---

[1] Defendant Creeden filed three briefs in support of his Ruel 29 motion: Brief on Count 1 (Doc. 413); Brief on Count 33 (doc. 414) and Brief on Count 53 (Doc. 415). The Government addresses these briefs in its Response.

the evidence is insufficient to sustain a conviction." When deciding a motion for acquittal, the court must consider the evidence "in the light most favorable to the government." *United States v. Dahda*, 853 F.3d 1101, 1106 (10th Cir. 2017). Thus, in assessing a motion for acquittal, the trial court must consider "whether any rational jury" could find defendant "guilt[y] beyond a reasonable doubt." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006); *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006). The court must consider direct and circumstantial evidence, along with reasonable inferences drawn from the evidence. *See United States v. Montgomery*, 468 F.3d 715, 719 (10th Cir. 2006); *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003)).

In doing so, the trial court may not "weigh conflicting evidence nor consider the credibility of witnesses" as those functions belong to exclusively to the jury as factfinder. *United States v. Moya*, 5 F.4th 1168, 1183 (10th Cir. 2021); *United States v. McKissick*, 204 F.3d 1282, 1289–90 (10th Cir. 2000)). That admonition "reflects a deep respect for the fact-finding function of the jury." *United States v. White*, 673 F.2d 299, 302 (10th Cir. 1982).

## II. <u>ARGUMENT</u>

### A. <u>Count One: RICO Conspiracy</u>

Defendant Creeden fails to carry his heavy burden to demonstrate that no rational juror could convict him under Count One. Rather than address the balance of evidence in the light most favorable to the Government, Defendant Creeden simply reprises legal arguments regarding the RICO Act rejected by the Court. (Doc. 143, Doc. 225).

#### 1. Creeden's Argument Regarding Distinctness is Legally Inaccurate Should be Disregarded

The Court should reject Defendant Creeden's distinctness argument because it is legally incorrect and would lead to absurd and dangerous results. By way of background, the

distinctness issue in the cases that Defendant Creeden cites arises from court interpretation of the plain meaning of the RICO statute. Section 1962(c) 18 U.S.C. § 1962(c) makes it unlawful "for any **person** employed by or associated with any **enterprise** . . . the activities of which affect, interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." (emphasis added). Because the text distinguishes the "person" from the "enterprise" itself, courts have interpreted this Section to mean that the defendant/person need be distinct from the enterprise.   Distinctness between the defendant/person and the enterprise is lacking only when there is complete unity between a particular defendant and the enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (holding RICO enterprise, a corporation, was distinct from defendant, a natural person who was the president and sole shareholder). *Accord CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1213 (10th Cir. 2020) (finding individual sole shareholder of corporations sufficiently distinct from his alter-ego corporations).

As the Tenth Circuit has explained, "[The distinctness] rule arises in cases attempting to hold a corporation responsible as the RICO defendant person for a RICO enterprise composed of the corporation and its officers and/or employees. . . . [The Tenth Circuit] specifically . . . noted the inapplicability of the rule to situations in which the RICO defendant person was the corporate employee or officer." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1183 (10th Cir. 2019) (reversing a district court order and holding that Tenth Circuit and Supreme Court precedent "make clear that the RICO distinctness requirement is satisfied when a corporate officer . . . is sued as the RICO defendant person and the alleged RICO enterprise is the corporation or association"). The relevant question is: Is the enterprise separate from the organizational defendant? That is why nearly every case Defendant Creeden

cites arises in the civil RICO context in which the defendant is an organization or corporation.[2]  By contrast, the Supreme Court has held that in cases like this one where the defendant is an organizational officer "conduct[ing] the [organization's] affairs in a RICO-forbidden way," "the [organization] owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status" *Cedric Kushner*, 533 U.S. at 163.  "And we can find nothing in the statute that requires more 'separateness' than that." *Id*.

The cases Defendant Creeden cites are inapposite because, as Defendant Creeden puts it, "[t]he government avoided those problems by charging the 'Jones Enterprise.'" ECF. No. 485. The Jones Enterprise was comprised of co-defendants, Jones, Creeden, and Kate Jones, among others. They formed an enterprise to illegally enrich themselves at the expense of union member dues. That the Indictment clearly articulates an enterprise separate from the defendants ends the distinctness inquiry.

In any event, the Government neither alleged that the Boilermakers Union itself constituted the RICO enterprise nor that all employees and officials in the union were members of the Jones Enterprise. The members of the Jones Enterprise comprised a particular group of officials who had taken control of the Boilermakers Union—which had existed for more than 120 years—during the period charged in the Indictment.  The evidence contained testimony from and about Boilermakers officials—for example, Tim Simmons, John Fultz,

---

[2] *Board of County Commissioners of San Juan County v. **Liberty Group***, 965 F.2d 879 (10th Cir. 1992) (ruling on whether the organizational defendant was separate from the enterprise); *Garbade v.* ***Great Divide Mining & Milling Corp.***, 831 F.2d 212 (10th Cir. 1987) (same); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) (holding RICO enterprise, a corporation, was distinct from defendant, a natural person who was the president and sole shareholder); *Brannon v.* ***Boatmen's First National Bank of Oklahoma***, 153 F.3d 1144 (10th Cir. 1998) (same); *George v.* ***Urban Settlement Services***, 833 F.3d 1242 (10th Cir. 2016) (same).

Arnie Stadnick, Amy Martin, Ashley Bathory, Debbie Goodwin—who performed their duties with fiduciary regularity and did not engage in blatant personal enrichment from the union's treasury.[3] The Boilermaker's Union was a union that had existed long before the Defendants had positions there. After the defendants were no longer part of the union, the union continues to exist. It filled the positions formerly held by Defendants Jones, Creeden and McManmon and eliminated Defendant K. Jones' position. It was not part of Defendant Creeden's job duties to embezzle funds for his personal enrichment. It was not part of his job duties to disregard the union's procedural safeguards such as the union's Constitution and International Executive Counsil requirements to obtain money from the union and bypass the requirement that union money be spent for the benefit of the union.

Moreover, Defendant Creeden's argument is dangerously flawed. He argues that officers of the union cannot constitute an enterprise because "alleged illegality does not sever organizational attribution." ECF No. 485 at 13. He goes on to write: "A legal entity acts through human beings, and conduct by officers or employees in their organizational capacity remains the entity's conduct for distinctness purposes even if later attacked as wrongful or criminal." *Id*. In other words, Defendant Creeden thinks that officials in a labor union cannot be held criminally responsible under the RICO Act for illegal activity accomplished using union machinery. That is not only legally incorrect but a dangerous proposition. Defendant's incorrect argument eviscerates one of Congress's core purposes in enacting the RICO Act— to combat union officers' use of union machinery to enrich themselves and others. *See* Findings of Facts and Purpose, Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84

---

[3] Defendant Creeden dismisses (Mot. p. 24) without explanation, moreover, that the proven racketeering activity transcended the Boilermaker Union itself, and reached the Bank of Labor. Upon that basis alone, the Jones Enterprise cannot be regarded as indistinct from the Boilermakers Union.

Stat. 941 (1970) ("The Congress finds that . . . [organized crime] money and power are increasingly used to infiltrate and corrupt legitimate business and labor union"); S. REP. NO. 91-617 at 79 ("[RICO] recognizes that present efforts to dislodge the forces of organized crime from legitimate fields of endeavor have proven unsuccessful. To remedy this failure, the proposed statute adopts the most direct route open to accomplish the desired objective. Where an organization is acquired or run by defined racketeering methods, then the persons involved can be legally separated from the organization . . . by the criminal law . . .").

Defendant Creeden's argument is not only in conflict with explicit Congressional intent but it is also in conflict with Supreme Court precedent. The Supreme Court has held that an organizational officer acting illegally is separate from the organization and can be held accountable separately. In *Cedric Kushner* the Court held that, with respect to the RICO Act: "Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise . . . .'" *Cedric Kushner*, 533 U.S. at 163. Defendant Creeden's argument also directly contradicts a long line of cases upholding convictions of labor union officials under the RICO Act for illegal racketeering conducted in office. *See e.g.*, *United States v. Browne*, 505 F.3d 1229, 1241 (11th Cir. 2007) (upholding multiple RICO count convictions of union officials who abused their leadership positions and used their understanding of the membership and organizational structure of two labor unions to "lin[e] their pockets"); *United States v. Le Roy*, 687 F.2d 610, 613, 617-18 (2nd Cir. 1982) (affirming the criminal conviction of a union officer whose embezzlement of labor union funds); *United States v. Kaye*, 556 F.2d 855, 862 (7th Cir. 1977) (upholding a union steward's RICO conviction and rejecting the union steward's argument that he "was acting in the conduct of his own affairs and not in the

conduct of [the union]'s affairs"). The Court should therefore reject this dangerous argument wholesale.

### 2.  The Government's Evidence Established that an Agreement Existed

RICO conspiracy requires no evidence of an explicit agreement among defendants to pursue the objectives of the Jones Enterprise, or any badges of secrecy like using burner phones or coded language, as Defendant Creeden suggests. *See* Modified Tenth Circuit Federal Pattern Jury Instructions (Criminal) 2.19 & 2.87 (2025 ed.); *United States v. Harris*, 695 F.3d 1125, 1131-32 (10th Cir. 2012). "To prove the existence of an agreement, the government does not have to prove an express or formal agreement was made. It must merely show the coconspirators tacitly came to a mutual understanding." *United States v. Rutland*, 705 F.3d 1238, 1250 (10th Cir. 2013). An "agreement may be inferred from the facts and circumstances of the case, including frequent contacts among the defendants and from their joint appearances at transactions and negotiations." *Sells*, 477 F.3d at 1236 (quotation cleaned up).

A reasonable juror could easily find that the evidence presented showed Jones Enterprise members agreed to the use of official Boilermaker facilities and procedures to, for example:

- purchase lavish restaurant meals unrelated to union business;

- place family members on the union's payroll who did little to no work;[4]

- approve expense for unnecessary travel to international destinations with luxury accommodations where little to no business was conducted;

---

[4] For example, Defendants agreed to pay K. Jones two years' worth of back wages though she performed no work. K. Jones received $2 million in cumulative salary, reimbursed expenses, and benefit contributions made on her behalf—all directed by N. Jones and authorized by Creeden;

7

- relocate family members for personal reasons;

- receive cash payouts for vacation time already used; and,

- enroll ineligible individuals in the Boilermaker Health Care Plan, including a personal friend on his death bed, including a full salary and pension.

The co-conspirator witnesses told the jury they believed that there was an agreement. Warren Fairley stated: "By participating in these meetings, I believe we --we agreed that we were going to expend money that wasn't necessary for the benefit of the organization." Trial Tr. at 807. He testified that it was an unwritten agreement by acquiescence. *Id*. at 943. Tyler Brown stated with respect to the Kate Jones part of the conspiracy: "Well, we certainly reached an agreement for her to be on staff, get this backpay, and she accepted the position." *Id.* at 1456. He went on to testify: "I mean, there was an agreement to do these things that ultimately are criminal activities, and it's why I pled guilty to a racketeering conspiracy." *Id*. at 1458. Stapp testified that she knew her role in the conspiracy was illegal. *See Id.*. at 1834-34.

A reasonable juror could find that this was an agreement by participation. Each co-conspirator manifested their assent to the conspiracy by performing their role in accomplishing its goals. The conspiracy could not have existed without each member agreeing to take necessary steps to accomplish it. Newton Jones, among other things, accrued and ordered lavish and unnecessary spending and payment for no show jobs. Kate Jones helped him conceal the magnitude of those expenditures by splitting the bills. Kathy Stapp and Tyler Brown processed employment and salaries for no show or little work jobs for Brian Daly and members of the Jones family. As Creeden admits in his brief, he "processed expenditures."

8

In sum, given the multiple witnesses that testified about the agreement and the circumstantial evidence indicating an agreement, Mr. Creeden cannot meet his high burden of showing that no reasonable juror could have found that there was an agreement.

### 3. The Government's Evidence Established One Connected RICO Conspiracy

Defendant Creeden reemploys the hub-and-spoke metaphor in arguing that the RICO conspiracy was instead several individual conspiracies between Defendant Newton Jones and each of the other defendants. Instruction No. 27, however, properly instructed the jury that the Government need not prove that each defendant knew every co-conspirator and knew about all the conspiracy activities.

There is sufficient evidence, moreover, for a reasonable juror to conclude that Defendants' conduct was not isolated separate conspiracies with Defendant Jones. The members of the conspiracy all knew each other for several years, worked for the same entity, and communicated with and among each other hundreds or thousands of times during the conspiracy's term regarding its unlawful activities. Trial Tr. at 806,809-10,812,981. With respect to Defendant Creeden specifically, he received Defendant Jones' directives through Tyler Brown; directed Kathy Stapp to pay numerous unauthorized expenditures; and approved unauthorized backpay, restaurant expenses, relocation expenses, international travel reimbursements, and/or cash payouts for vacations for Defendants Kateryna Jones, Warren Fairley, Cullen Jones, and Lawrence McManamon. Trial Tr. at 1204-05, 1693, 1696-97.

### B. Count Forty-Eight: $7 Million Loan to Bank of Labor

Defendant Creeden's argument that no reasonable juror could find that the $7 million loan of MORE Fund money to the Bank of Labor in 2021 and 2022 was unauthorized because

9

of a $20 million line-of-credit to the Bank of Labor over 10 years prior, Gov. Ex. 11b at 30, defies logic. The jury possessed substantial evidence to reject this view of the events.

First, common sense dictates that if the $7 million loan was already authorized under a twelve-year-old line of credit, the Bank of Labor could just request those already allocated funds. There would be no need for the parties to draft a separate loan agreement with specific repayment terms, interest rates, options, etc. Gov. Exs. 205, 206. Second, the loan was from the MORE Fund which was not even established until 2018, nine years after the line of credit. There is no evidence to suggest that the initial line of credit was a blanket approval for any separate loans in the future. The proposition that the Bank of Labor could receive those funds based on a line of credit opened 12 years earlier, which may or may not still be active, can be and was in fact reasonably dismissed by the jury.

That the Bank's Board of Directors approved the loan agreements, and that Defendant Creeden abstained from that vote is irrelevant. The salient issue under section 501(c), is whether the *Boilermakers Union*, and *not* the Bank, formally authorized the loans. The evidence before the jury established that Defendants Jones and Creeden deliberately bypassed the Boilermakers Board of Trustees and its International Executive Council in executing the loans. Defendant Creeden's argument that he observed the Bank's conflict-of-interest policy is a red herring considering that fact that he defied the Boilermakers Union's conflict-of-interest policy which prohibits any involvement by him with respect to union decisions about the Bank. Gov. Ex. 121.

Defendant Creeden also argues that no conversion of union funds occurred and that the Boilermakers Union lost no funds because of the loans. The $7 million, however, was indisputably converted to the use of the Bank during the term of the loan. The loan was from

the MORE fund which was comprised of additional fees the union charged members on top of their dues to be used specifically for recruitment. During that period, the union could not use that money for the intended purpose of recruitment because Jones and Creeden lent the money to the Bank.

That the Bank of Labor eventually repaid the MORE Fund with interest is also beside the point because the union never officially approved the initial expenditure in the first place. Nothing in the law excuses an unauthorized expenditure on that basis. The jury could reasonably rely upon those grounds to conclude that the Bank's repayments of the loans does not absolve a failure to properly authorize the use of the MORE Fund money in the first instance.

Lastly, Defendant Creeden's contention that he cannot be lawfully convicted of Count 48 because he did not personally benefit from the $7 million loan is incorrect as a matter of law as reflected in both 29 U.S.C. § 501(c) and in the jury instructions. That contention advances a legal argument and not any shortfall in evidence pursuant to Rule 29. Section 501(c) prohibits conversion of union funds to the use of the offender, "or the use of another." 29 U.S.C. § 501(c) ("Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, **or the use of another**, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed . . . ") (emphasis added). Consistent with that clear statutory language, the Court's Instruction No. 28 stated as follows:

> Counts 2–7, 10–11, 14–16, 18–24, 27, 30–31, and 34–48 of the Indictment charge certain defendants with embezzlement from a labor organization in violation of 29 U.S.C. § 501(c). This statute makes it a crime for any person to embezzle, steal, or unlawfully and willfully abstract or convert to his or her own use, **or the use of another,** any of the moneys, funds, securities, property, or other assets of a labor organization by which he or she is employed, directly or indirectly. (emphasis added)

11

Accordingly, the jury could reasonably and lawfully find that Defendants committed various offenses under section 501(c) even if they did not personally benefit from the offense. Defendant Creeden erroneously asserts that the Government failed to object to Instruction No. 28. The Government did object to that instruction positing that the Court should repeat the "to the use of another language" a second time within Instruction No. 28 Trial. Tr. at 3959-60. In any event, Instruction No. 28 read as a whole properly instructed the jurors on what section 501(c) prohibits and the jury relied on substantial evidence to reach its conclusion of guilt. Defendant Creeden's argument that the failure to repeat "to the use of another" somehow estops the Government or invalidates his conviction on Count 48 is without merit.

In any event, the record demonstrated that Defendant Creeden enjoyed a multi-million-dollar compensation package from the Bank of Labor requiring him to do absolutely nothing. The premise that Defendant Creeden held no personal interest in whether the Bank which was supplying him with a lucrative no-show executive position received the $7 million loan may be reasonably dismissed by jurors.

## C. Count 53: Wire Fraud Conspiracy

Defendant seeks an acquittal on Count 53 for conspiracy to commit wire fraud arguing that the circumstances of his employment by the Bank of Labor was devoid of any deception. However, the fraudulent premises charged in Count 53 was not that his employment or salary from the Bank was a secret or falsely asserted. Count 53 clearly charges that the false premises was that, while he was "employed" by the Bank of Labor, he was not actually performing any work:

> 3. It was part of the scheme and artifice to defraud devised by Defendants NEWTON JONES and WILLIAM CREEDEN to falsely represent that they were working fulltime as Chief Executive Officer and Senior Executive Vice-President,

12

respectively, for the Bank of Labor, **when in fact, neither Defendant NEWTON JONES nor WILLIAM CREEDEN were performing any productive work for the Bank of Labor in those positions.**

4. It was part of the scheme and artifice to defraud devised by Defendants NEWTON JONES and WILLIAM CREEDEN to deprive the Bank of Labor of salary payments, benefit contributions, and other paid benefits as employees of the Bank of Labor when Defendants JONES and CREEDEN **were not required to work, and provided little or no productive work, for the Bank of Labor in exchange for those salary payments, benefit contributions, and paid benefits as employees.**

ECF No.1 at at 51-52.

Nonetheless, Defendant Creeden continues that the Bank's leadership approved his salary and benefits. The Bank's leadership or its Board of Directors are not synonymous with the Bank itself. As the evidence showed, the Boilermakers Union owned 56 percent of the Bank and members of the International Executive were aware that he and Defendant Jones had positions with the Bank but were unaware of the details of which positions, the enormity of the compensation they were receiving, and that they were receiving it in exchange for doing almost nothing in return.

Certainly, the jury could conclude that the Bank's other shareholders, as well as its depositors and other customers, were unaware that the Bank was paying more than one million dollars per year to "full-time" executives who were not, in fact, working. Robert McCall, the now President of the Bank, testified that Defendant Creeden did no additional work as Senior Executive Vice President than what he was doing in his role on the Board. *See* Trial. Tr. at 2958. He also testified that Defendant Creeden's position did not exist before Newton Jones appointed him and the Bank discontinued the position after he left because it was not necessary. *See* Trial Tr. at 2944, 3169-70. Megan Elder, in HR for the Bank, said the same thing. *See* Trial Tr. at 3185-86, 3192.

13

Defendant Creeden's remaining arguments concerning absence of property in the fraud and materiality fall further afield. Simply put, a reasonable juror could find that an individual receiving nearly a half million dollars per year based on the charade that he was working full-time certainly represents a material falsehood resulting in the acquisition of property.

**D.  Counts 2 through 48: Embezzlements from the Boilermakers Union**

With respect to Counts 2 through 48, Defendant Creeden repeats his peculiar reading of the Boilermakers Constitution whereby the International President exercises all executive authority over expenditures, and the International Secretary-Treasurer holds no independent authority or responsibility for expenses. In this view, the Secretary-Treasurer's role is merely to countersign expenses determined unilaterally by the President and he is obligated to sign off on whatever expenditures the President desires.

The jury had more than sufficient evidence to reject this tortured reading of the Secretary-Treasurer's role within the Boilermakers Constitution. The terms of Article 9.1 of the Constitution itself identifies the Secretary-Treasurer having "custody" of all the union's property and to sign warrants "properly countersigned by the President." Gov. Ex. 3 at 41-42. Given that the President may only direct expenditures which are "necessary" for the union's objectives, the duty to sign only those warrants which are "properly countersigned" may be reasonably regarded as requiring more than just a reliable signature. *Id*. at 41.

The record also included testimony from two presidents of the Boilermakers Union (Tim Simmons and Warren Fairley), a former Secretary-Treasurer (Kathy Stapp) and a former chief-of-staff and attorney (Tyler Brown) all agreeing that the Boilermakers Constitution does not vest the President without unlimited authority to spend funds as he see fit or shrink the Secretary-Treasurer's role to mere signatory. *See* Trial Tr. at 293 (Simmons testifying that

Creeden was supposed to approve non-recurring expenditures); *Id.* at 304 (Creeden would approve and countersign expenditures);*Id..* at 600 (Fairley testimony that the "Secretary-treasurer's duties are to oversee basically the finances of the organization. He's the checks and balances of the organization. If the president wants to spend money, the secretary-treasurer is the one who keeps up with the funds of the organization, the money that's being spent, to countersign the expenses of the organization that the president authorizes. The secretary-treasurer's duties, mainly, is to handle the finances of the organization.");*Id..* at 1692 (Stapp testifying that: "it stated in the constitution that --that all expenses have to be approved by both the international president and the international secretary-treasurer. . . .But when I was international secretary-treasurer, I approved all expenses when I was in the office, which was 99 percent of the time."); *Id.* at 1234 (Tyler Brown testifying that: "The international president and secretary-treasurer have to countersign for all expenses."). As President Simmons observed, the Boilermakers Constitution creates a system of "checks and balances" with respect to expenditure of union funds. *See Id.* at 127. Viewing that evidence in light most favorable to the Government, Defendant Creeden's proposed interpretation of the Boilermaker Constitution may be reasonably dismissed.

Significantly, Defendant Creeden's motion fails utterly to reconcile his position with his fiduciary duties under the LMRDA to expend union funds solely for the benefit of the union and its members. Witness after witness testified that officials of the Boilermakers Union are subject to fiduciary duties under federal law which exist apart from, and in fact supersede, any constitutional provisions. *See* Trial Tr. at 174 (Simmons); *Id.* at 1223-24 (Brown); *Id.* at 1542 (Stapp); *Id.* at 2210 (Stojak). Testimony and numerous exhibits revealed that Defendants Jones and Creeden were not only aware of their fiduciary obligations under

15

the LMRDA but actively required lower union officials to adhere to them, lest they face criminal prosecution. Gov. Exs. 16-24, 26. Accordingly, the jury's guilty verdict on these counts should stand.

### E. Additional Counts

Defendant Creeden argues that insufficient evidence existed for his conviction under Count 19 because he did not personally benefit from approval of James O'Leary's trip to Italy in April 2022. As noted above, personal benefit is not a required element under section 501(c) provided that the conversion of funds was for the benefit of another. Defendant Creeden, moreover, was personally aware of the lack of necessity for O'Leary's trip to the Amalfi Coast, having been on the trip himself and personally approving O'Leary's expenses. Gov. Ex. 319 at 9; Gov. Ex. 320.

With respect to Count 45, Defendant Creeden argues (Mot. p. 49) that he cannot be held responsible for a cash payout for vacation time to Defendant McManamon because he had already retired as Secretary-Treasurer when the payment was made. The record evidence demonstrates Defendant Creeden's claim to be false. The government's evidence showed that Creeden was Secretary-Treasurer during that time period. Payroll records from ADP show that Defendant McManamon received the vacation payout at issue on August 13, 2023, Gov. Ex. 414, and such payment was undoubtedly approved by the Secretary-Treasurer's office earlier than that date. The minutes of the International Executive Committee, however, indicate that Defendant Creeden retired "on August 22, 2023 at 6:34 p.m.", Gov. Ex. 12, p. 65, after McManamon's payouts. The Court should not disturb the jury's verdict with respect to Count 19 or 45.

Finally, Defendant Creeden's motion, disregarding procedural posture, standard of review, and the difference between the legislative and judicial branches, argues that the Government's case places no "limiting principles" on section 501(c) or the application of the RICO Act to organizations and that the Court has permitted the Government to "draw the line" concerning expenditures "after-the-fact." He appears to disagree with the very purpose of the LMRDA and the RICO Act and once again asks this Court to issue a ruling preventing prosecution of union officials for racketeering and criminal breaches of fiduciary duties while in office. To the extent he is fighting for a change in the law, he is fighting in the wrong arena with the wrong weapons. His arguments should be taken up with Congress not this Court. And especially not on a Rule 29 motion where the relevant question is *not* what Creeden thinks the law should be, but whether there was sufficient evidence for a reasonable juror to find him guilty viewing the evidence in the light most favorable to the Government. The Court should disregard these inappropriate arguments.

## <u>Conclusion</u>

WHEREFORE, the Government respectfully requests that the Court deny Defendant Creeden's motion to for acquittal pursuant to Rule 29.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
UNITED STATES ATTORNEY

By: /s/ *Vincent Falvo*
VINCENT FALVO
Trial Attorney
Violent Crime and Racketeering Section
United States Department of Justice
1301 New York Avenue, NW
Washington, D.C. 20530
vincent.falvo@usdoj.gov

By: /s/ *Alexandra Swain*
ALEXANDRA SWAIN
Trial Attorney
Violent Crime and Racketeering Section
United States Department of Justice
1301 New York Avenue, NW
Washington, D.C. 20530
Alexandra.swain@usdoj.gov

FAIZA H. ALHAMBRA
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6904
913-551-6541 (fax)
Faiza.Alhambra@usdoj.gov
Kan. S. Ct. No. 24525

JABARI WAMBLE
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
913-551-6730
913-551-6541 (fax)
Jabari.wamble@usddoj.gov
Kan. S. Ct. No. 22730

18

## CERTIFICATE OF SERVICE

I certify that on July 27, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

/s/ Faiza H. Alhambra
Faiza H. Alhambra
Assistant United States Attorney